GEORGE C. CHAPLINE, Appellant, v. ISAAC B. STONE,
Respondent.

| 77 | 523 |
| 96 | 489 |

St. Louis Court of Appeals, December 27, 1898.

1. **Marriage Contract**: CONSENT: CAPACITY TO MAKE IT. The con-
sent of parties is essential to the validity of all contracts. Any defect
of capability to enter into a contract, as want of sufficient mind and
memory to understand and comprehend the nature and terms of the
contract, will invalidate the contract. Marriage being a civil contract
is not excepted from the rule, but like any other contract to make it
valid, the contracting parties must have capacity to make it.

2. ————: ————. In the case at bar the evidence shows that the de-
fendant was at no time in her life possessed of sufficient mind and
memory to comprehend the nature and obligations of the marital re-
lation, or sufficient mental capacity to make any contract whatever.

DISSENTING OPINION OF JUDGE BIGGS.

3. **Witness**: PLAINTIFF INCOMPETENT. In the case at bar plaintiff
alleged in the petition that his wife was insane when he married her;
that she so continued during their long married life, and that just
prior to the institution of his suit, she had been so declared by a
court of competent jurisdiction and he was therefore an incompetent
witness for any purpose.

*Appeal from the St. Louis City Circuit Court.*—HON. JAMES E. WITHROW, Judge.

REVERSED (*with directions*).

R. J. DELANO and ADIEL SHERWOOD for appellant.

This is an equity case and will be reviewed and considered *de novo* in this court. Benne v. Schnecko, 100 Mo. loc. cit. 258; McElroy v. Maxwell, 101 Mo. loc. cit. 308. Our circuit courts have all the powers possessed by the old common law and equity courts and with respect to cases of this character all the powers of the ecclesiastical courts under the English system. Crump by Guardian v. Morgan, 3 Ired. Eq. (N. C.), loc. cit. 96; Wightman v. Wightman, 4 John. Ch. 343; Dickson v. Stewart, 1 Mur. 99; Ward v. Vichars, 2 Hay. 164.  *  *  * Idiocy, lunacy or imbecility are frauds upon the other party as much so as are any other frauds in the procurement of the marriage and equity on that ground alone will give relief here as in other cases. True v. Ranney, 21 N. H. loc. cit. 83; Foster Adm. v. Means, 1 Spear's Eq. (S. C.) 569; Lord Portsmouth's Case, 1 Hagg. Ec. Rep. 356; Keyes v. Keyes, 22 N. H. 553; 2 Kent. Com. 66, 67; Browning v. Reane, 2 Phillimore, 69. While it is true that such a marriage, so-called, is void *ab initio* and needs no decree of any court to make it so, still for reasons of public policy and good morals a court of equity will grant relief. Poynter Mar. & Div. (Law Lib., Vol. 13) *156; Cro. Eliz. 857; Wightman v. Wightman, 4 John. Ch. 343; Wagmire v. Jetmore, 22 Ohio St. loc. cit. 273; Crump v. Morgan, 3 Ired. Eq. (N. C.) 91; Browning v. Reane, 2 Phillimore, 69. And it is the duty of the court to enter the decree. Parnell v. Parnell, 2 Phill. 158; Crump v. Morgan, 3 Ired. Eq.

(N. C.) 91, 158; Stock Law *non · compotes* (Law Library, Vol. 25), 20, *34; Cro. Eliz. 857; Poynter Mar. Div. (Law Lib., Vol. 13), *156. In these cases suit may be brought by or against the guardian or committee alone, or by or against the insane person and the guardian. Stock Law *non compotes* (Law Lib., Vol. 25), 20, *34; Lord Portsmouth's Case, Adams Eng. Ec. Rep. 63; Johnson v. Kincade, 2 Ired. Eq. (N. C.) 470; 2 Chitty Genl. Prac. 460. There are certain legal principles so fundamental, so much a part. of the warp and woof of our system of jurisprudence, and so full of common sense and every day meaning that when stated they are at once appreciated and understood. They are part of all contracts in every relation of life including the contract of marriage. The legal mind sees as the necessary elements of a contract. (a) the subject-matter; (b) sufficient consideration; (c) persons competent to contract (i. e. of sound mind); and, (d) an agreement of the parties, that is to say, the concurring assent of at least two minds. Browning v. Reane, 2 Phill. 69; Morrison before the Delegates, 1745; Parker v. Parker, 2 Lee, 282 in 1757; Clandesley v. Evans, 2 Lee, in 1763. In short, when one of the parties is an idiot, lunatic or imbecile at the time of the pretended consummation, there can be no contract (of marriage) for the same reasons that deny the existence of a contract under like circumstances in any other transaction of life. See cases cited under fourth subdivision. For like reasons it is held that an innocent party to a bigamous marriage is at liberty to marry again. Drummond v. Irist, 52 Iowa, 41; Reeves v. Reeves, 54 Ill. 332; Glass v. Glass, 114 Mass. 563. And also that an agreement signed by a person in a state of complete intoxication is void. Pitt v. Smith, 3 Camp. 33; Clement v. Mattison, 3 Rich. 93. And evidence of two marriages, the

former of which is void, will not sustain an indictment for bigamy. 3 West. Law Jour. 134; 5 West. Law Jour. 376. And while it is true that the party who sets up insanity or lunacy must prove it still having once established the lunacy, the *onus* is cast upon the other party to prove by testimony equally convincing that the contract was entered into during a lucid interval. Browning v. Reane, 2 Phillimore, 69; Poynter Mar. & Div. (Law Lib., Vol. 13), *150. When a marriage is void *ipso facto*, acquiescence, long cohabitation and issue, or the desire of the parties to adhere can not amend the original defect. Poynter Mar. & Div. (Law Lib., Vol. 13), *157. The doctrine of estoppel or of *laches* does not apply in cases like this. Glass v. Glass, 114 Mass. 563; James v. James, 5 Blackf. (Ind.) 141; Martin v. Martin, 22 Ala. 86; Kenley v. Kenley, 2 Yeates, 207.

No brief filed for respondent.

BLAND, P. J.—Plaintiff by bill in equity seeks to have annulled a marriage contract between himself and Lizzie Chapline, which was celebrated on June 10, 1879, in the county of St. Louis, state of Missouri, on the ground that the said Lizzie was insane at the time of the marriage, and that she has been continuously insane since said marriage, and at all times incapable of entering into a contract of marriage, or of fulfilling marital obligations. The plaintiff further stated that on proceedings had before the probate court of the city of St. Louis, which were instituted by her brother, Isaac H. Stone, the said Lizzie was on December 10, 1897, adjudged insane, and that Isaac B. Stone was duly appointed her guardian, and is now acting as such.

The answer of the guardian, Isaac B. Stone, admitted that the said Lizzie had been found insane as

stated in the petition, and that he was acting as her guardian. As to other allegations of the petition, he said he had not sufficient knowledge or information to form a belief. A hearing was had before the court, who after hearing all the evidence, dismissed the petition. Plaintiff in due time filed a motion for rehearing, which was overruled, whereupon he appealed.

Plaintiff introduced the following witness, who testified in substance as follows: Isaac H. Stone said he was sixty-two years old, and the brother of Lizzie Chapline, who was about forty-five years of age; that Lizzie was not of sound mind at or before the time of the marriage; that she had been of unsound mind all her life, and was incapable of realizing the duties and responsibilities of married life; that her mind was that of an infant, knew nothing except obedience; was not possessed of sufficient mentality to understand business affairs or the nature of a contract, and that her mental condition was well known to her family; that she did many things mechanically about the house, but did them by imitation and could not reason from cause to effect; that her mental condition had continued about the same until about five years before the trial, when it became much worse, and has continued worse.

R. M. Kerley testified that he was a physician; had known Lizzie for some time previous to her marriage and was present at the marriage; that at the time of her marriage and since her mental condition was simply idiotic, had a mind like that of a child three or four years old; that her mind did not grow and develop with the growth of her body; was not at all capable of understanding the nature of a marriage contract at the time she was married, and that her mental condition had been the same since he first knew her, but he had not seen much of her of late years.

Isaac B. Stone testified that Lizzie Chapline was

his aunt, that he had known her ever since he could remember; that her power of comprehension was bad, she did what she saw others do, followed the example of others; does not seem to understand when you tell her anything; does not grasp an idea when you explain anything to her; you have to explain things to her as you would to a child, and had been in that condition as long as he had known her; that he was the guardian of Lizzie; that Chapline and his wife lived about thirteen years at his grandfather's and several years by themselves after that; that she kept house during this time for plaintiff, and was neat about her person as far as he knew.

Plaintiff's testimony, as to the mental condition of Lizzie, was corroborative of that of the other witnesses. He further testified that he did not know of her mental condition when he married her, although he had known her for several years, but had not been much in her company, and never in her company alone; that she was hard of hearing and he attributed her seeming "oddities" to that; that he wanted a home, proposed to Lizzie and was accepted; that no child was ever born of the marriage; that she did not perform the marriage relations of a wife; that he had always provided for her and had secured her a monthly income of $40 during her natural life.

Mr. McEntire, attorney for the defendant, read in substance the following statement to the court: "That the plaintiff in this case had filed a suit against defendant Chapline in the St. Louis circuit court to obtain a divorce; then defendant, Isaac H. Stone, consulted Mr. McEntire and an application was made to the probate court for a guardian for defendant Chapline. Mr. Stone informed Mr. McEntire that defendant had been of unsound mind for many years and was at the time of the attempted contract of marriage. Proceedings

were had in the probate court before a jury and defendant Chapline was declared of unsound mind and then it was that this suit to annul the marriage was instituted; the members of Chapline's family do not care to make any opposition to this proceeding; every member of defendant's family is aware of this proceeding; that the deposition read is the deposition of her own brother; her guardian is present in court and also a physician who knew her from the very beginning; plaintiff has made provision for the support of defendant, that is to say, to pay her forty dollars ($40) a month during the rest of her life, the payment being secured by lien upon real estate."

No evidence was offered by defendant. The case is one in equity, and it should be reviewed and considered *de novo* by this court. Benne v. Schnecko,100 Mo. loc. cit. 258; McElroy v. Maxwell, 110 Mo. loc. cit. 308. Section 6840, Revised Statutes of 1889, enacts that "Marriage is considered in law as a civil contract, to which the consent of the parties capable in law of contracting is essential." The consent of the parties is essential to the validity of all contracts. Any defect of capability to enter into a contract, as want of sufficient mind and memory to understand and comprehend the nature and terms of the contract, will invalidate the contract. There must be a meeting of minds of the parties to make any contract. Barton v. Hunter, 59 Mo. App. 610; Robinson & Farrell v. Estes, 53 Mo. App. 582; Green v. Cole, 103 Mo. 70. Marriage being a civil contract is not excepted from the rule, but like any other contract, to make it valid, the contracting parties must have capacity to make it. Turner v. Meyers, 1 Hagg. Con. R. 416; Wagmire v. Jetmore, 22 Ohio St. loc. cit. 273; True v. Ranney, 21 N. H. loc. cit. 83; Londonderry v. Chester, 2 N. H.

278; Clark v. Clark, 10 N. H. 382; Weightman v. Weightman, 4 John. Ch. 343; Crump v. Morgan, 3 Ired Ed. (N. C.) 91; Bell, Adm'r, v. Bennett, 73 Ga. loc. cit. 786; Foster, Adm'r, v. Means, 1 Spear's Eq. (S. C.) 569; 2 Kent Com. 76; 1 Bl. Com. 434.

From the evidence there is no room to doubt that Lizzie Chapline was at no time in her life possessed of sufficient mind and memory to comprehend the nature and obligations of the marital relation, or of sufficient mental capacity to make any contract whatever. She was an idiot—nothing more or less, according to the testimony. Idiots and lunatics have never been considered as capable of making binding contracts. The strange features in this case are that the plaintiff did not discover this idiocy before he married her, and, stranger still, that the members of her family stood by and saw the marriage ceremony performed without objection, and astoundingly strange that the plaintiff lived with her for so many years, after the discovery of her mental deficiency and under the circumstances he relates; but all this does not make that valid which in the beginning was invalid; in other words plaintiff is not estopped by his conduct to plead the invalidity of the contract, for nothing has intervened since the marriage to validate it; the rights of the parties are the same to-day as they were on the day the marriage was celebrated. The trial court seems to have been controlled in its opinion by the opinion of Judge Hayden in Slais v. Slais, 9 Mo. App. 96. In that case the husband had been first divorced from his wife, afterward remarried her and then sought to annul the marriage on account of the insanity of the wife. The court, in that case, says that the insanity of the wife seems to have been an afterthought." In this case Chapline first brought a suit for divorce, which he promptly dismissed on the suggestion that proceedings would be taken to declare

his wife insane and have a guardian appointed. After his wife was declared insane a guardian was appointed, and he immediately instituted this suit. There is nothing in the record to indicate that the insanity of his wife was *"an afterthought"* on the part of the plaintiff. On the contrary, her insanity was established beyond all reasonable doubt. Idiocy was and had been during all her life her normal condition. The plaintiff says, and we have no doubt truthfully, that he bore with her in that condition because he thought he had "got into it," to use his words, "and would make the best of it he could," and that he dreaded notoriety." His conduct, so far as the evidence discloses, shows him to have acted patiently and with long suffering, and that his conduct towards his unfortunate wife has been manly and honorable. We think he is clearly entitled to the relief he prays for, and reverse the judgment with directions to the circuit court to enter a decree setting aside and annulling the marriage between him and Lizzie Chapline on account of the insanity of the said Lizzie at the time the marriage was celebrated.

Judge BOND concurs; Judge BIGGS dissents.

### DISSENTING OPINION BY JUDGE BIGGS.

The facts of this case and upon which the plaintiff relies for equitable relief are remarkable. I have been unable to find any case in the books approaching it. The manner in which the case was defended is also remarkable. In fact there was no defense at all, as appears from the statement of counsel for the guardian. From his statement it seems that Isaac H. Stone (the brother of defendant), and Isaac B. Stone (the guardian), concluded that the material rights of the unfortunate kinswoman were not worth defending. The learned circuit judge thought differently.

Actions in equity to annul contracts of marriage for want of capacity to enter into them are not infrequent. Many such cases are found in the reported decisions. In most all of them, however, the imbecile was the complainant. It has been in such cases that some of the courts, acting under a strong impulse to protect the unfortunate, have been led to state the tests of marriageable capacity too broadly. Thus they have adopted the tests applicable to ordinary business contracts. The best considered cases and the text writers take a different view. Mr. BISHOP, in speaking of the mental capacity necessary to a marriage contract, says: "The question is not altogether of *brain quantity* or of *brain quality*, in the abstract, but it is whether or not the mind could and did act rationally regarding the precise things in contemplation. In a marriage case it is whether the alleged insane person acted rationally regarding marriage and the particular one in dispute; not, indeed, whether his conduct was wise, but whether it proceeded from a mind *sane as respects the thing done*." (1 Bish. Mar. & D., sec. 600.) The author continuing the subject in the succeeding section says: "Practically, persons coming together in true marriage, not in a mere marriage for convenience, say together in effect, 'We so love each other that we bind ourselves in law to continue this love, and live together in the way of husband and wife, in mutual dependence and support, to the exclusion of all adverse loves and doings, during our joint lives.' If this is sanely done, it is marriage; insanely, it is not." Nelson in his work on the law of "Divorce and Separation," says: "In a suit to annul a marriage on the ground that one of the parties was insane and therefore incapable of consenting to the marriage, different tests of insanity have been applied. But the most reasonable test is believed to be the ability to under-

stand the nature of the marriage contract *and not the ability to enter into ordinary contracts or to make a will.*" (2 Nelson on Divorce and Separation, sec. 658.) In the following section the author says: "A person understands the nature of the marriage contract who knows that marriage is an agreement between a man and a woman to love each other, to live together as husband and wife, in mutual dependence, for life, unless grave causes justify their divorce." In Elzey v. Elzey, 1 Houston, loc. cit., 319, the principles of the foregoing texts are clearly enunciated. The court in that case said, "It would be dangerous, perhaps, as well as difficult, to prescribe the precise degree of mental vigor, soundness and capacity essential to the validity of such an engagement, which after all, in many cases depends more on sentiments of mutual esteem, attachment and affection, which the weakest may feel as well as the strongest intellects, than on the exercise of a clear, unclouded reason, or sound judgment, or intelligent discernment and discrimination, and in which it differs in a very important respect from all other civil contracts." In such cases this court in the case of Slais v. Slais, 9 Mo. App. 96, said: "A contract of marriage is not lightly to be pronounced void on the ground that one of the parties was insane and incapable of contracting. The testimony by which such cases are often supported is open to suspicion, and nowhere ought the discernment of the chancellor to be more employed than in *weighing witnesses* who testify as to insanity."

I will refer briefly to the evidence. In reviewing the case the testimony of the plaintiff must be disregarded. Plainly he could not testify. He alleged in the petition that his wife was insane when he married her; that she so continued during their long married life and that just prior to the institution of his suit she

had been so declared by a court of competent juris-
diction. He was an incompetent witness for any pur-
pose. The circuit judge made a desperate effort to
prevent him from testifying, but he was overruled by
counsel. With his testimony out of the case we have
that of Isaac H. Stone, Dr. R. M. Kerley and Isaac B.
Stone.

Isaac H. Stone testified that the defendant was an
idiot from her birth; that all persons who had any
acquaintance with her knew this, and that at the time
of her marriage she did not have sufficient mind to
understand the nature and obligations of the marriage
contract. The witness lives in Carroll county, Mis-
souri. He says that he is a farmer by occupation.
Judging from his answer (if given without dictation)
I would say that he is a lawyer, and a very good one.
He was not present at the marriage of his sister, and
he does not attempt to state her conduct after the
marriage. He does not seem to have taken any partic-
ular interest in her welfare until the plaintiff insti-
tuted a suit for divorce against her (while she was
temporarily absent in the state of Tennessee), on the
ground of alleged indignities, etc. As soon as Isaac
H. learned of the institution of that suit, he came to
St. Louis and caused the sanity of his sister to be
inquired into. The probate court declared her to be
insane, and Isaac B. Stone, his son, was appointed her
guardian. Thereupon the plaintiff dismissed his
action of divorce, and instituted the present action,
and thereupon Isaac H. and Isaac B. held a conference
and concluded that it was best for all parties con-
cerned not to defend the action. In the Slais case,
*supra*, it was stated by Judge Hayden that in such
cases as we have here the testimony of witnesses on the
question of insanity should be closely scrutinized and
accepted with suspicion. The testimony of Isaac H.

if true, convicts his father and mother of compelling their idiotic child to become a prostitute under the guise of a mock marriage, and according to his testimony the plaintiff was a party to it for he says that the idiocy of his sister was known to all of her acquaintances. Again, if Isaac H. knew of the contemplated marriage of his sister and failed to protest against it, he is equally guilty. I read somewhere in the record a statement either of counsel or of one of the witnesses, that the defendant's father had made suitable provision for her in his will. The nature of the provision was not stated. If known, it would probably furnish an explanation for the anxiety of Isaac H. and his son Isaac B. to have the marriage contract annulled, as the defendant is childless and is incompetent to make any disposition of her property. I don't think the testimony of Isaac H. is worthy of consideration.

Dr. R. M. Kerley was the next witness. He testified that he was present at the marriage of the plaintiff and defendant. In his examination in chief he testified that at the time of the marriage he did not think that the defendant had sufficient mind to comprehend the nature and obligations of a marriage contract. The court conducted the cross-examination. "Q. Her (defendant's) father and mother were present at the marriage? A. Yes, sir. Q. And you and your wife? A. Yes, sir. Q. Who else? A. That is all. I don't think that Mrs. Miller was there. Q. Do you know whether Mr. Chapline knew about it? A. I do not know what his mind was. Q. You folks stood by and saw the marriage performed? A. Yes, sir. Q. Between Mr. Chapline and a woman whom you considered idiotic? A. She was simple minded."

Isaac B. Stone, the guardian, testified to the condition of defendant's mind for the past ten years. He

did not profess to know anything about her mental condition at the time of the marriage. He said "she was what I would call one that did not know exactly everything; her power of comprehension was bad; she didn't comprehend things; she did what she saw others do, followed the example of others." The court also conducted the cross-examination of the witness. The court: Q. "*She has had sufficient intelligence to keep house and to attend to the ordinary affairs of life?* A. *Yes, sir.* Q. Did they occupy a large or small house? A. When living with grandpa on Brooklyn street they lived with my grandfather and grandmother. Q. They didn't live there all the time? A. They lived there thirteen years. Q. After that time they were to themselves? A. Had a small house, four rooms. Q. They lived together several years after that? A. Yes, sir. Q. And she kept house? A. Yes, sir. Q. *Was she ordinarily neat about her person?* A. *So far as I ever saw.* I have not been in her house for the last five or six years."

Now the plaintiff asserts that at the date of the marriage the defendant did not have sufficient mind to understand the nature and the obligations of the marriage contract. Under the decision in Slais v. Slais, *supra*, it devolved on him to establish that averment by the clearest and most definite evidence. Has this been done is the question? I think not. The only competent testimony of any direct value to plaintiff is that of Dr. Kerley. Surely the plaintiff can derive no benefit from that of Isaac B. As far as it is pertinent, it is against him. Isaac B. knew nothing about the condition of the defendant's mind in 1879. He could only speak for the past ten years. The gist of his statement is that she was only weak minded; for he admits that she intelligently discharged the ordinary duties of a housekeeper, and that she was neat and clean as to her

person. Dr. Kerley's statements on his examination in chief support the issue, but upon the cross-examination he was compelled to say that she was only weak-minded. This last statement is the truth, for it appears without contradiction that she kept house for six years; that she attended to her household duties, and that she was cleanly in her habits. An idiot would not have been capable of doing these things. Hence under the rule lain down by the authorities cited, I am of the opinion that the circuit court was clearly right.

There is another view which in my opinion is fatal to plaintiff's case. He has come into a court of equity. He must come with clean hands, and he must show that he is an injured and innocent party. It is asking too much of any court to believe and decide that he lived for four months at the house of the father of his wife; that he associated with her daily; escorted her to church; courted and married her, and did not find out that she was an idiot until after he had married her.

Again it is an established principal that equity aids only the diligent. The plaintiff lived with his wife for nineteen years. For thirteen years of the time he found a comfortable home at her father's house, and now in her old age he asks us to assist him in "putting her aside." I can not consent to it. I therefore dissent from the conclusion reached by my associates and have thought it proper to give the reasons for my dissent.